

I N  T H E

# Indiana Supreme Court

Supreme Court Case No. 25S-MI-101

## Family & Social Services Administration
*Appellant (Defendant below)*

–v–

## Robert E. Saint
*Appellee (Plaintiff below)*

---

Argued: December 12, 2024 | Decided: April 23, 2025

Appeal from Marion Superior Court

No. 49D06-2210-MI-35140

The Honorable Kurt M. Eisgruber, Judge

On Petition to Transfer from the Indiana Court of Appeals

No. 23A-MI-2742

---

**Opinion by Justice Massa**

Chief Justice Rush and Justice Goff concur.

Justice Molter concurs with separate opinion.

Justice Slaughter did not participate in this matter.

FILED
Apr 23 2025, 1:21 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

**Massa, Justice.**

Appellee Robert Saint made an Access to Public Records Act request for a legal memorandum, or "White Paper," created by the private entity HealthNet and given to Family & Social Services Administration (FSSA) for use during Medicaid settlement negotiations. Although FSSA argued that the White Paper was excepted from disclosure as intra-agency deliberative material, the trial court ordered the document's disclosure. On appeal, FSSA again argues the deliberative material exception applies because FSSA used the document for decision-making purposes. Finding, however, that the White Paper is not "intra-agency material" that can thus be withheld, we affirm the trial court.

# Facts and Procedural History

HealthNet, Inc. ("HealthNet") is a Federally Qualified Health Center that owns and operates medical clinics throughout Indianapolis. It provides services to indigent and Medicaid-enrolled patients. Appellant FSSA oversees Indiana's Medicaid program.

Appellee Saint is an attorney representing a whistleblower in a "qui tam" action, a type of lawsuit that enables private plaintiffs to benefit by exposing those who defraud the government.[1] The whistleblower here sought claims under the False Claims Act,[2] alleging HealthNet received

---

[1] "Qui tam" is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means "who pursues this action on our Lord the King's behalf as well as his own." *See Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 768 n.1 (2000); *see also 3* W. Blackstone, Commentaries on the Law of England *160 (1768). Qui tam actions were recognized in Europe prior to our nation's founding and were adopted in some of our earliest colonial statutes. *See* Marc S. Raspanti & David M. Laigaie, *Current Practice and Procedure Under the Whistleblower Provisions of the Federal False Claims Act*, 71 Temp. L. Rev. 23, 23–24 (1998); *see also U.S. ex rel. Stillwell v. Hughes Helicopters, Inc.*, 714 F. Supp. 1084, 1086 n.2 (C.D. Cal. 1989) (listing statutes enacted by the First Congress permitting qui tam actions). The private person bringing the action is referred to as the "qui tam relator," or more colloquially, the "whistleblower." *See Stevens*, 529 U.S. at 769; Raspanti & Laigaie, *supra* note 1 at 23 n.1.

[2] In 1863, Congress—through the persistent urging of President Abraham Lincoln—passed the False Claims Act as a principal mechanism for combatting fraud against the United States government, particularly that involving "unscrupulous businessmen and wartime profiteers who sold broken rifles, lame horses, and useless ammunition to the

Medicaid reimbursements to which it was not entitled. HealthNet's attorney prepared a legal memorandum, referred to as a "White Paper," and submitted it to FSSA for consideration during settlement negotiations between HealthNet and FSSA.

While settlement negotiations were still ongoing, Saint filed a request to FSSA to inspect and copy the White Paper under Indiana's Access to Public Records Act (APRA). Specifically, Saint requested from FSSA:

> Copies of public records pertaining to all white [papers] submitted on behalf of HealthNet between October 1, 2018, until March 31, 2019, regarding HealthNet's claim for Medicaid reimbursements arising out of approximately $4.6 to $4.7 Million Dollars for mental healthcare (wraparound claims between 2011 and 2016 for the services of mid-level providers).

FSSA's attorney responded that, after a due diligence search of FSSA's records, he could not release the requested records because they were protected by the attorney-client privilege and were thus non-disclosable under Indiana Code Section 5-14-3-4(a)(1) and (a)(8).

One of Saint's clients filed suit against FSSA to compel compliance with APRA. Saint was subsequently substituted in as plaintiff. Saint argued that "as a member of the public," he was interested in the White Paper and that the denial was arbitrary and capricious, while FSSA contended its reasoning for denying the request was based in law.

Saint later filed a "Petition for Order to Compel Disclosure of 'White Paper' or Alternatively an In Camera Examination and Hearing." In his petition, Saint argued FSSA could not meet its burden to establish that an attorney-client relationship and confidential communication existed between HealthNet's attorneys and FSSA. Saint further argued that FSSA was not obtaining legal advice in the White Paper, and that even if an

---

Union Army." Raspanti & Laigaie, *supra* note 1 at 24 (citing 132 Cong. Rec. H22339 (daily ed. Sept. 9, 1986) (statement of Rep. Berman)). Following various amendments, the False Claims Act is currently codified under 31 U.S.C. §§ 3729–3733.

attorney-client privilege existed, that privilege was waived upon tendering the White Paper to FSSA.

FSSA responded by arguing that the White Paper fell under two exceptions to APRA. First, FSSA reasserted the attorney-client privilege under Indiana Code Section 5-14-3-4(a)(1) and (a)(8), and argued, "An opposing party seeking to settle a claim with the government has a reasonable expectation that materials submitted to governmental entities, like FSSA, for purposes of settlement discussions will remain confidential." Second, FSSA cited to the deliberative materials exception to disclosure under subsection 4(b)(6), stating:

> [T]his white paper was received by FSSA, **who used it within their office**, making it an intra-agency record. . . . This white paper was an expression of legal opinion from [HealthNet's] counsel that FSSA used for the purpose of decision making in settlement negotiations. As an intra-agency document, FSSA has the discretion to withhold the White Paper from disclosure under APRA.

Following a hearing, the trial court granted Saint's petition and ordered FSSA to deliver a copy of the White Paper for the court's in-camera review. The trial court found that FSSA failed to demonstrate the existence of an attorney-client relationship between FSSA and HealthNet's attorneys, and moreover, that a common-interest privilege did not apply because there was neither an ongoing joint enterprise nor a common legal interest. The trial court also found that when HealthNet's attorney tendered the White Paper to FSSA, it was not deliberative material, nor was it prepared for the purpose of FSSA's decision-making. Following its in-camera review, the trial court ordered FSSA to deliver the White Paper to Saint within ten days. FSSA filed a motion to stay pending appeal, which the trial court granted.

On appeal, FSSA reraised the deliberative material exception, arguing (1) it applied because the White Paper contained statements of opinion received by FSSA as part of its settlement negotiations with HealthNet; and (2) was ultimately used within FSSA's office in deciding whether to settle. FSSA relied on the Court of Appeals' prior decision in *Groth v.*

*Pence*, 67 N.E.3d 1104, 1122 (Ind. Ct. App. 2017), *trans. denied*, for the proposition that legal white papers *used* for agency decision-making may be withheld under APRA. In addition, FSSA also argued that (1) HealthNet was a private contractor under the deliberative materials exception because "it contracts with the FSSA to provide services to patients enrolled in Medicaid"; and (2) the confidentiality exception under Indiana Code Section 5-14-3-4(a)(8) applies because "[c]ommunications that are part of confidential settlement negotiations are confidential under the rules of the Indiana Supreme Court. *See* Ind. Evidence R. 408; Ind. Alternative Dispute Resolution Rule 2.11." FSSA did not reargue attorney-client privilege on appeal.

The Court of Appeals panel, however, affirmed the trial court in a divided published decision. *Fam. & Soc. Servs. Admin. v. Saint*, 237 N.E.3d 693 (Ind. Ct. App. 2024). After acknowledging that FSSA abandoned its attorney-client privilege argument, the majority found the deliberative materials exception did not apply because the White Paper was neither "intra-agency" nor "interagency" as required under Indiana Code Section 5-14-3-4(b)(6). The court also declined to follow *Groth*, finding the relevant language in that decision "arguably amounts to dicta." *Id.* at 697, 698. Lastly, the court found FSSA waived both its private contractor and confidentiality arguments because FSSA either failed to raise them at the trial court, in their opening brief, or both. *See id.* at 698–99 nn.7, 11 (citing *Safeco Ins. Co. of Ind. v. Blue Sky Innovation Grp., Inc.*, 230 N.E.3d 898, 907 (Ind. 2024) (holding that when an argument is not made in the trial court, appellate review of that argument is waived) and *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind. 2005) (holding that an argument is waived if it is made for the first time in a reply brief)).

Judge Mathias dissented, arguing that Section 5-14-3-4(b)(6) exempts "[r]ecords that are intra-agency or interagency advisory *or* deliberative material," and thus the material need only be "deliberative" to be exempt, not intra-agency or interagency. *Id.* at 700–01 (Mathias, J., dissenting) (emphasis in original). Further, Judge Mathias found that the source of the White Paper's origin was irrelevant under Section 5-14-3-4(b)(6) and that FSSA's "use" of the memorandum transformed it into "intra-agency material." *Id.* at 701 (citing *Groth*, 67 N.E.3d at 1122).

FSSA petitioned for transfer, which we now grant through separate order, thereby vacating the Court of Appeals' decision. Ind. Appellate Rule 58(A).[3]

## Standard of Review

Alleged APRA violations are reviewed *de novo*, without deference to the public agency, and the initial burden in the trial court is on the public agency. Ind. Code § 5-14-3-9(f), -(g)(1). The public agency meets its burden of proof by (A) demonstrating that the undisclosed records fall within an exception listed under Indiana Code Section 5-14-3-4, and (B) establishing the content of the record with adequate specificity without relying on conclusory statements or affidavits. *Id.* § -(g)(1). Once the agency has met its burden of proof in the case of a discretionary exception under Indiana Code Section 5-14-3-4(b), the burden then shifts to the requesting party to prove that the denial of access is arbitrary or capricious. *Id.* § -(g)(2). "An arbitrary and capricious decision is one which is 'patentably unreasonable' and is 'made without consideration of the facts and in total disregard of the circumstances and lacks any basis which might lead a reasonable person to the same conclusion.'" *Sullivan v. Nat'l Election Def. Coal.*, 182 N.E.3d 859, 868 (Ind. Ct. App. 2022) (quoting *A.B. v. State*, 949 N.E.2d 1204, 1217 (Ind. 2011)). "Whether documents fall under an exception to APRA's general rule of disclosure is a matter of statutory construction." *Id.* (citing *J. Gazette v. Bd. of Trs. of Purdue Univ.*, 698 N.E.2d 826, 828 (Ind. Ct. App. 1998)).

## Discussion and Decision

The sole question before us is whether FSSA satisfied its burden of proof to establish the White Paper was subject to the deliberative material

---

[3] We are granting transfer to address the deliberative material exception. As mentioned above, the Court of Appeals found FSSA's alternative arguments were waived. Furthermore, in addition to finding these arguments waived, the court also found these arguments failed on the merits. As to both its waiver and merits analysis of those waived issues, we summarily affirm the Court of Appeals. *See* Ind. Appellate Rule 58(A)(2).

exception under Indiana Code Section 5-14-3-4(b)(6). Finding it did not, we affirm the trial court.

The opening section of APRA provides:

> A fundamental philosophy of the American constitutional form of representative government is that government is the servant of the people and not their master. Accordingly, it is the public policy of the state that all persons are entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and employees. Providing persons with the information is an essential function of a representative government and an integral part of the routine duties of public officials and employees, whose duty it is to provide the information. This chapter shall be liberally construed to implement this policy and place the burden of proof for the nondisclosure of a public record on the public agency that would deny access to the record and not on the person seeking to inspect and copy the record.

Ind. Code § 5-14-3-1. As our courts have recognized, "APRA is intended to ensure Hoosiers have broad access to most government records[.]" *Evansville Courier & Press v. Vanderburgh Cnty. Health Dep't*, 17 N.E.3d 922, 928 (Ind. 2014). To achieve its intended purpose, APRA provides that "[a]ny person may inspect and copy the public records of any public agency during the regular business hours of the agency[.]" Ind. Code § 5-14-3-3(a). Where this opportunity is denied, the requesting party "may file an action in the circuit or superior court of the county in which the denial occurred to compel the public agency to permit the person to inspect and copy the public record." Ind. Code § 5-14-3-9(e).

Although APRA promotes the disclosure of public records, "[t]he Act contains 'a myriad of broad exceptions'" that exempt certain records from these disclosure requirements. *WTHR-TV v. Hamilton Se. Schs.*, 178 N.E.3d 1187, 1190 (Ind. 2022) (quoting *Robinson v. Ind. Univ.*, 659 N.E.2d 153, 156 (Ind. Ct. App. 1995), *trans. denied*); *see generally* Ind. Code § 5-14-3-4. For example, records described in Indiana Code Section 5-14-3-4(a) are deemed "mandatory exceptions" and "*may not* be disclosed by a public

agency as a matter of law." *Sullivan*, 182 N.E.3d at 867 (emphasis in original). In contrast, records described under Indiana Code Section 5-14-3-4(b) are deemed "discretionary exceptions" and "are excepted from disclosure *at the discretion* of the public agency." *Id.* (emphasis in original).

Relevant to the issue before us is the discretionary exception for "deliberative material" under Indiana Code Section 5-14-3-4(b)(6), which covers "[r]ecords that are intra-agency or interagency advisory or deliberative material, including material developed by a private contractor under a contract with a public agency, that are expressions of opinion or are of a speculative nature, and that are communicated for the purpose of decision making." For a public agency to invoke the deliberative material exception, the agency must demonstrate three requirements: (1) that the records are intra-agency or interagency deliberative or advisory material, including material developed by a private contractor under a contract with a public agency; (2) the records contained expressions of opinion or of a speculative nature; and (3) the records were communicated for the purpose of decision making.[4] As it is understood, the "ultimate purpose" of this exception "is to prevent injury to the quality of agency decisions," as the "'frank discussion of legal or policy matters' in writing might be inhibited if the discussion were made public; and . . . the 'decision' and 'policies formulated' would be poorer as a result." *Newman v. Bernstein*, 766 N.E.2d 8, 12 (Ind. Ct. App. 2002) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150, 151 (1975)).

---

[4] In the separate opinion below, Judge Mathias recounts that the deliberative material exception exempts from disclosure "[r]ecords that are intra-agency or interagency advisory *or* deliberative material," and reasons that the final "or" means the material need only be "deliberative" to invoke the exception without regard as to whether it is "intra-agency" or "interagency." *Saint*, 237 N.E.3d at 701 (Mathias, J., dissenting) (emphasis in original); *see also id.* ("[T]he majority's analysis omits the italicized 'or' that comes before deliberative material. The 'or' means that deliberative material need not be either intra-agency or interagency. Rather, material that is merely deliberative (and an expression of opinion or of a speculative nature) is exempt from disclosure."). But while this reading implies three separate categories—(1) intra-agency, (2) interagency, and (3) advisory or deliberative—this is not the case. Instead, "intra-agency" or "interagency" modifies "advisory or deliberative." Thus, while the material must be advisory or deliberative, it must also be either intra-agency or interagency (or be from a private contractor) for the exception to apply.

Here, neither party disputes that FSSA qualifies as a "public agency" and that the White Paper qualifies as a "public record," subjecting both to APRA's general disclosure requirement. *See* Ind. Code § 5-14-3-2(q)(1) (defining "public agency" as any "board, commission, department, division, bureau, committee, agency, office, instrumentality, or authority, by whatever name designated, exercising any part of the executive . . . power of the state"); *id.* § -(r) (defining "public records" to include "any writing . . . created, received, retained, maintained, or filed by or with a public agency"). To avoid the disclosure requirement, FSSA is relying on the discretionary exception for "deliberative material." Both parties concede that FSSA has satisfied the second and third prongs of this exception—that is, the White Paper contained expressions of opinion and was used for agency decision-making. The parties, however, dispute whether FSSA has satisfied the first prong—particularly, whether FSSA has shown that the White Paper was "intra-agency" deliberative material. While APRA defines "public agency," it does not explicitly state what constitutes "intra-agency" material. FSSA argues, though, that because the White Paper was being *used* for agency decision-making as noted in *Groth*, it qualifies as intra-agency deliberative material and thus may be withheld from disclosure.

In *Groth*, 67 N.E.3d at 1109, appellant William Groth submitted an APRA request for documents related to then-Governor Mike Pence's decision to join a Texas lawsuit against then-President Barack Obama with respect to certain presidential executive orders related to immigration. Although Governor Pence provided some unredacted and partially redacted documents in response to Groth's request, including an unredacted email from then-Texas Governor-Elect Greg Abbott's chief of staff, he declined to provide a "white paper" legal memorandum that was created by the Texas deputy solicitor general and attached to the chief of staff's email. *Id.* at 1110–11. The memorandum, which served as a "follow up" to a "Governors-Only meeting" in which Governor-Elect Abbott discussed with other governors the proposition of preparing a legal challenge to President Obama's immigration orders, "outlined the legal theories supporting Texas' legal challenge[.]" *Id.* at 1120 (cleaned up). Groth complained about the withholding of this memorandum and

subsequently filed suit. *Id.* at 1111–12. Governor Pence's office responded by claiming the memorandum was excepted from disclosure as privileged attorney-client communication under Section 5-14-3-4(a)(1) and (8) and as deliberative material under Section 5-14-3-4(b)(6). *Id.* at 1117. Both the Public Access Counselor and trial court agreed with Governor Pence, finding that Governor Pence's response properly complied with APRA. *Id.*

On appeal, a majority of the Court of Appeals panel affirmed. The court's primary holding was that the memorandum was excepted from disclosure under attorney-client privilege. Specifically, the court found the common-interest doctrine applied because "[w]hen two or more persons, with a common interest in some legal problem, jointly consult an attorney, their confidential communications with the attorney, though known to each other, will of course be privileged in a controversy of either or both the clients with the outside world." *Id.* at 1120 (quoting *Corll v. Edward D Jones & Co.*, 646 N.E.2d 721, 725 (Ind. Ct. App. 1995)). In addition, because privileged attorney-client communications fall under the list of mandatory exceptions to disclosure under Section 5-14-3-4(a), "the Governor had no discretion to release the information." *Id.* at 1122. *Groth*, thus, is fundamentally an attorney-client privilege case, and its holding in that regard remains binding precedent on trial courts.

However, after discussing the attorney-client privilege exception at length, the court then briefly addressed the deliberative material exception, finding that exception applied as well. *See id.* There, the court stated:

> The Governor *used that record within his office, making it an intra-agency record*. And the white paper was an expression of legal opinion used by the Governor for the purpose of decision making. Accordingly, the Governor acted within his discretion when he withheld the white paper under the deliberative material exception.

*Id.* (emphasis added).

Judge Vaidik dissented, arguing neither exception should have applied. *See id.* at 1123–24. Targeting the majority's conclusion as to the deliberative material exception, Judge Vaidik stated:

The majority also finds that the white paper is protected from disclosure as deliberative material. I disagree. . . . The majority finds that the white paper is a protected "intra-agency" record. Although the white paper was not prepared by anyone within the Governor's office, the majority, without citation to authority, finds that it qualifies as an intra-agency record because Governor Pence "used" it within his office. I do not believe that a public agency can protect a record from disclosure as deliberative material just by "using" it.

*Id.* at n.13 (Vaidik, C.J., dissenting) (cleaned up).

Following the Court of Appeals' decision in this matter, Judge Vaidik, now writing for the majority, declined to follow *Groth*'s alternative rationale. *See Saint*, 237 N.E.3d at 698 ("FSSA says that *Groth* controls here and that so long as the document was a part of the agency's decision-making process, it is protected. Saint responds that this reading of the deliberative-material exception is too broad. . . . We agree with Saint and decline to follow *Groth*.") (cleaned up). As the majority stated:

[The deliberative material] exception applies to communications (e.g., letters, memorandums, and emails) from one agency employee to another, if the communication consists of opinions or thoughts about a future agency decision. Applying this here, the deliberative-material exception simply does not apply. Saint requested the White Paper, which was a legal memorandum communicated by HealthNet—a private healthcare provider and **not** a public agency—to FSSA. Had Saint sought communications from one agency employee to another about the White Paper, then the exception would apply. But that is not what Saint seeks.

*Id.* (emphasis in original). According to the majority in the decision below, the "use" of material within the agency does not automatically transform that material into "intra-agency material." Rather, to be "intra-agency material," the material must be generated within the agency and communicated between two of the agency's employees.

Because the decision below rejected *Groth*'s surplus holding on deliberative material, this raised the question as to which approach is the

most faithful in determining what material constitutes "intra-agency material" under the deliberative material exception to APRA. Therefore, the issue before us today is essentially one of statutory interpretation. Based on a consideration of the deliberative material exception's plain language under APRA, as well as a review of prior decisions addressing when material constituted intra-agency material, we agree with the approach taken by the decision below. In doing so, we hold that "intra-agency material" is material that originates from, and is communicated between, employees of the same agency.

"Our first task when interpreting a statute is to give its words their plain meaning and consider the structure of the statute as a whole." *ESPN, Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1195 (Ind. 2016) (cleaned up). Furthermore, "we consider both what the statute does—and does not—say, because we cannot 'add words or restrictions.'" *WTHR-TV*, 178 N.E.3d at 1191 (citation omitted). Where a statute's language is ambiguous, we will "avoid an interpretation that renders any part of the statute meaningless or superfluous," *ESPN*, 62 N.E.3d at 1199 (cleaned up), and "do not presume that the Legislature intended language used in a statute to be applied illogically or to bring about an unjust or absurd result," *Anderson v. Gaudin*, 42 N.E.3d 82, 85 (Ind. 2015) (cleaned up). "Exceptions to public disclosure laws should be construed strictly, but expressed exceptions specified by the legislature are not to be contravened." *Sullivan*, 182 N.E.3d at 868 (citing *Robinson*, 659 N.E.2d at 156).

To begin, while APRA defines "public agency," neither it, nor our caselaw, specifically defines "intra-agency." Thus, we consult general dictionary definitions on what the prefix "intra" means. *See Rainbow Realty Grp., Inc. v. Carter*, 131 N.E.3d 168, 174 (Ind. 2019) (internal citation omitted) (quoting Ind. Code § 1-1-4-1(1)) ("[W]hen a statutory term is undefined, the legislature directs us to interpret the term using 'its plain, or ordinary and usual, sense.' We generally avoid legal or other specialized dictionaries for such purposes and turn instead to general-language dictionaries."). General dictionaries define "intra" as "within or inside." Legal dictionaries seem to suggest the same. *See Intra*, MERRIAM-WEBSTER, Intra- Definition & Meaning - Merriam-Webster (last visited

Apr. 22, 2025) (defining "intra" as "within"); *Intra*, CAMBRIDGE DICTIONARY, INTRA- | English meaning - Cambridge Dictionary (last visited Apr. 22, 2025) (defining "intra" as "used to form adjectives meaning 'within'"); *see also Inter- vs Intra-*, DICTIONARY.COM, Inter- vs Intra- Dictionary.com (last visited Apr. 22, 2025) (comparing the definition of "inter," meaning "between or among groups," with "intra," meaning "within or inside"); *cf. Intra*, Black's Law Dictionary (12th ed. 2024) (defining "intra" as "within"). Therefore, under a plain dictionary reading, when an agency is claiming material is "intra-agency," it suggests the agency is claiming the material relates to being "within or inside" that agency, rather than outside of it. But while this reading is rather straightforward, it does not necessarily address which approach is the most appropriate, as both *Groth*'s "use" analysis and the majority's "between agency employees" analysis *could* arguably fit the bill under the right circumstances and be "within" the agency.

A review of prior cases, however, lends credence to the approach we adopt today—that is, that the material must originate from and be communicated by employees of the same agency to qualify as "intra-agency."

For example, in *Indiana State Highway Commission v. Morris*, 528 N.E.2d 468, 470 (Ind. 1988), this Court addressed the procedural sufficiency of a plaintiff's notice under the Tort Claims Act where an injured motorist sued the Indiana State Highway Commission (today known as the Indiana Department of Transportation or INDOT). There, although the motorist only provided notice to the Commission and not the Attorney General, as is required by the Tort Claims Act, the Commission later passed the notice to the Attorney General on its own accord. *Id.* The record revealed that the plaintiff discovered this after deposing the Commission employee who sent the Attorney General a copy of the tort claim notice, and from agency admissions that the Attorney General timely received the notice from the deposed employee. *Id.* at 470. The Court found that because the Attorney General timely received a copy of the tort claim notice, the plaintiff had satisfied their procedural duty under the Tort Claims Act. *Id.*

Chief Justice Shepard, joined by Justice Dickson, concurred with the Court's decision but wrote separately to address the revelation of the Commission's communication to the Attorney General, arguing that the communication was privileged and thus should not have been subject to disclosure in discovery. *Id.* Chief Justice Shepard noted that "[t]he relationship of attorney and client clearly applies to the Attorney General and the state agencies he represents," and further, that "a privileged communication between attorney and client is exempt from public inspection because it is declared confidential by statute and Supreme Court rule." *Id.* at 474–75 (Shepard, C.J., concurring). Moreover, in a footnote attached to the latter statement, he also analogized why the communication was non-disclosable under the deliberative material exception:

> While this exemption is not particularly applicable to attorney-client confidences, *the communication in this case was intra-agency*. One purpose for the communication was to allow the Attorney General to determine the advisability of settling the claim, and thus was made for the purpose of [decision-making]. It was therefore exempt from disclosure at the discretion of the agency.

*Id.* at 475 n.1 (emphasis added). Thus, according to Chief Justice Shepard's reasoning, because the communication was generated, sent, and received by individuals *within the same agency*—or as there, a fiduciary of the agency—and because the communication was, in theory, intended to remain with that agency alone, the communication would have been "intra-agency."

In *Newman*, 766 N.E.2d at 9, the Court of Appeals directly addressed the deliberative material exception in deciding whether the Marion County Prosecutor's Office was required to disclose its plea negotiation policies. There, the prosecutor denied two written requests for records of policies related to plea negotiations and agreements because the records were "intra-agency advisory or deliberative in nature, communicated for the purpose of decision making." *Id.* Following a request for in-camera review, the trial court ordered the disclosure of two policies, finding the prosecutor failed to establish these documents fell within the deliberative

material exception as the court questioned "whether the deputy prosecutors—those for whom the plea policy manual was created—were decision makers" under the exception. *Id.* at 11.

On appeal, the prosecutor argued that the policies were protected under the deliberative material exception for two reasons: (1) that "there is no question that the memoranda submitted for *in camera* review are intra-agency" because "[t]he memoranda are from the Prosecutor of Marion County, or from one of his deputies, to other deputy prosecutors working in the Marion County Prosecutor's Office"; and (2) "the memoranda are clearly communicated for the purpose of decision making." Br. of Appellant at 16, *Newman*, 766 N.E.2d 8. The Court of Appeals agreed with the prosecutor and reversed, finding the deliberative material exception applied. *Newman*, 766 N.E.2d at 12. Specifically, the court stated it did "not think the plea policy manual should be disclosed" because "the deputy prosecutors are decision makers" and "[the prosecutor] does not issue a new final directive for each and every plea negotiation to be mechanically applied by the deputy prosecutor." *Id.* The court did not explicitly state what made the policies "intra-agency." However, as part of reaching its conclusion that the deputy prosecutors were "decision makers," the court focused on the interaction of the memoranda between the prosecutor and his deputy prosecutors, as well as the potential harm that could occur to the prosecutors' decision-making capabilities if the plea-bargaining policies escaped outside the prosecutors' clutch. *Id.* at 12–13. And under the circumstances there, the policies at issue were generated and sent entirely "in-house" between the prosecutor and deputy prosecutors—all of whom were "within" the same agency—for the deputy prosecutors to use in planning their plea negotiations.

Lastly, in *Sullivan*, 182 N.E.3d at 862, the Court of Appeals considered whether correspondence between Indiana's Secretary of State and the National Association of Secretaries of State (NASS) was subject to nondisclosure under the deliberative material exception. There, the trial court denied the Secretary's motion for summary judgment, finding the Secretary failed to prove that documents exchanged with NASS were excepted as intra-agency or inter-agency material. *Id.* at 865. On appeal, the Secretary focused on arguing the correspondence was excepted as

intra-agency deliberative material, asserting they "regularly communicate with NASS and its members for the purpose of discussing policy and to aid the Indiana Secretary of State's Office in making decisions as an agency, . . ." *Id.* at 871. The Court of Appeals, however, disagreed, stating that while "NASS may act as a medium for the exchange of information between states and foster cooperation in the development of public policy . . . the Secretary has not shown that the particular records requested by NEDC—emails between the Secretary and NASS—were intra-agency communications . . . ." *Id.* (cleaned up). Moreover, despite addressing the deliberative material question after *Groth*, the *Sullivan* court did not follow *Groth*'s "use" analysis, even where the Secretary explicitly argued they used the communications within their office for decision-making purposes. The court, instead, disregarded this argument and only provided a *cf.* citation to *Groth* and its reasoning. *See id.*

Taking these cases and the decision below together, a common-denominator can be derived from the facts of each—that is, where courts have found material to be "intra-agency," the case only involved one agency where **all players** were agents or employees of that agency and the communication was generated **within** that agency. This can be seen in the *Morris* concurrence, where the Indiana State Highway Commission's communication of the tort claim notice went from a Commission employee to the Commission's counsel (the Attorney General), and was especially noticeable in *Newman*, where the plea-bargaining policies were generated entirely within the prosecutor's office and distributed only amongst the prosecutor and deputy prosecutors. In comparison, where courts found the material was *not* intra-agency, such as in *Sullivan* and the majority's decision below, the communication, despite being "used" within the agency, originated from outside the agency.

As to that last point, *Groth* appears to stand as an outlier, as no subsequent decision has elected to follow *Groth*'s interpretation of deliberative material. To the degree that *Groth* has been cited within this state, those cases simply follow *Groth* for its primary holding with respect to attorney-client privilege. Moreover, when looking to the only two cases since *Groth* to have considered the deliberative exception—*Sullivan* and the decision below—those decisions could have, but chose not to, follow

*Groth*, even where the agency explicitly argued that their "use" of the material qualified it as intra-agency material. Thus, this effort to avoid actively relying on *Groth*'s other holding, or at the very least, to provide a mere *cf.* citation to its reasoning, is telling.

Furthermore, the cases demonstrate that today's approach is the most consistent with a plain reading of the statute. As previously noted, both our approach and *Groth*'s *could* be consistent with a plain reading of "within" under the right circumstances. In particular, if we assume our approach and take a communication between two employees of the same agency, that communication would clearly be "intra-agency" because it would both originate from and be used within the agency. Where *Groth*'s approach breaks down, however, is when one considers the approach broadly. Under *Groth*, if we assumed that simply "using" material within an agency made it "intra-agency," then the material would *always* be intra-agency, regardless of whether it originated from within the agency or outside of it. This is because the agency, as a matter of simply invoking the exception, would *have to* "use" the communication. But importantly, this reading would distort the plain text of the deliberative material exception under APRA because it would essentially eliminate the distinction between "intra-agency," "interagency," and even "private contractor," all three categories of which address from *where* the material came. Because we must "avoid an interpretation that renders any part of the statute meaningless or superfluous," *see ESPN*, 62 N.E.3d at 1199 (cleaned up), the broad approach taken under *Groth*'s other holding cannot endure.

Lastly, this reasoning aligns with the underlying purpose behind APRA, which is to ensure Hoosiers maintain a broad access to government documents. *See Evansville Courier*, 17 N.E.3d at 928. As part of that purpose, it is stipulated within APRA that policies of general disclosure should be liberally construed, *see* Ind. Code § 5-14-3-1, while exceptions to disclosure "should be construed strictly," *Sullivan*, 182 N.E.3d at 868. Thus, given these imputed limitations, we must read "intra-agency" as a narrow, rather than broad, classification for purposes of the exception. We therefore conclude that our newly adopted approach—finding material to be "intra-agency material" where it was generated

within and sent between employees of the same agency—is the narrower, and thus correct, approach.

Applying this to the case at hand, we find that because the White Paper was generated by HealthNet—an outside private entity—and sent to FSSA, it does not fall under the deliberative materials exception as "intra-agency material." While FSSA may have used the White Paper for the purpose of deciding whether to settle with HealthNet, FSSA did not generate the White Paper within its agency. As such, we find FSSA has failed to meet its burden of proof in establishing the White Paper was an "intra-agency" record under the deliberative material exception.

## Conclusion

Because we find the deliberative material exception does not apply, we affirm the trial court's order requiring the disclosure of the White Paper.

Rush, C.J. and Goff, J., concur.
Molter, J., concurs with separate opinion.
Slaughter, J., did not participate in this matter.

ATTORNEYS FOR APPELLANT

Theodore E. Rokita
Attorney General of Indiana

Angela N. Sanchez
Chief Counsel of Appeals
Indianapolis, Indiana

Benjamin M. L. Jones
Section Chief of Civil Appeals
Indianapolis, Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana


ATTORNEY FOR APPELLEE

Robert E. Saint
Emswiller, Williams, Noland & Clarke, LLC
Indianapolis, Indiana

**Molter, J., concurring.**

I join the Court's opinion and write separately to note three points.

First, although we hold the White Paper was not exempt from disclosure as deliberative material, that does not mean it could not have been withheld under a different APRA exemption. FSSA argued on appeal that the document could have been withheld as part of confidential settlement negotiations under our Court's rules, and that argument might have some force. But as the Court of Appeals correctly noted, by failing to raise that argument before the trial court, FSSA waived any claim to a settlement-negotiations exemption. The Court's opinion summarily affirms not only the Court of Appeals' conclusion that the argument was waived, but also its conclusion that the argument would fail on the merits anyway. By only summarily affirming those conclusions, though, the conclusions remain "Court of Appeals' authority" rather than our Court's authority, Ind. Appellate Rule 58(A)(2), so future Court of Appeals panels may revisit the issue on the merits, *see Wellman v. State*, 210 N.E.3d 811, 816 n.4 (Ind. Ct. App. 2023) ("Indiana does not recognize horizontal stare decisis.").

Second, and relatedly, FSSA abandoned its attorney-client privilege argument on appeal, so that question is not before us. *Ante*, at 5. Thus, while the Court leaves in place as "binding precedent on trial courts" the attorney-client privilege holding in *Groth v. Pence*, 67 N.E.3d 1104 (Ind. Ct. App. 2017), *trans. denied*, that too remains the authority of the Court of Appeals rather than our Court. *Ante*, at 10.

Finally, while the White Paper itself does not fall under the deliberative material exemption, derivative materials may still fall under the exemption. For example, suppose an agency employee receives an external document like the White Paper and then passes it to a superior within the agency along with a note saying the employee agrees or disagrees with the White Paper's analysis. The employee's note may still be covered by the deliberative material exemption—even though the White Paper is not—because the note, unlike the White Paper, would be an intra-agency communication for deliberative purposes. *See ante*, at 17 ("In particular, if we assume our approach and take a communication

between two employees of the same agency, that communication would clearly be 'intra-agency' because it would both originate from and be used within the agency.").